[Crim. No. 8063. In Bank. Jan. 27, 1965.]

In re HARRY A. CRUZ on Habeas Corpus.

Harry A. Cruz, in pro. per., and Robert N. Beechinor, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, and Gordon Ringer, Deputy Attorney General, for Respondent.

SCHAUER, J.*—This matter is before us on an order to show cause issued upon an application for habeas corpus filed in propria persona by petitioner Harry A. Cruz, who is confined for treatment as a narcotics addict (Pen. Code, § 6450) in the branch of the California Rehabilitation Center located in the California Men's Colony, East Facility. We appointed counsel to represent petitioner in these proceedings.

Petitioner contends that in the prehearing stages of his commitment process the authorities failed in several respects to comply with the strict statutory requirements of Penal Code section 6450[1] and hence that his commitment is invalid under *In re Jones* (1964) 61 Cal.2d 325, 327[1]-328[3] [38 Cal. Rptr. 509, 392 P.2d 269], and *In re Raner* (1963) 59 Cal.2d 635, 641-643 [6] [30 Cal.Rptr. 814, 381 P.2d 638]. We need not reach that issue, however, for the record shows that in the course of the proceedings petitioner personally asked to be committed, and with advice of counsel and full knowledge of

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[1]Insofar as here pertinent section 6450 directs that "Proceedings [to determine whether a person is addicted or in imminent danger of addiction to narcotics] shall be conducted in substantial compliance with Sections 5353, 5053, 5054, and 5055 of the Welfare and Institutions Code."

his rights signed a waiver of the statutory requirements that were held controlling in *Raner* and *Jones*. The facts also fail to support petitioner's second main contention, i.e., that his transfer to and current confinement in the California Men's Colony branch of the California Rehabilitation Center constitutes "cruel and unusual punishment" under *Robinson* v. *California* (1962) 370 U.S. 660 [82 S.Ct. 1417, 8 L.Ed.2d 758].

The waiver signed by petitioner is on a typed form which states: "I, Harry A. Cruz, in order to begin treatment for my narcotic drug addiction as soon as possible, hereby freely and voluntarily make this waiver in open court of my statutory rights in this proceeding, including but not limited to those rights contained in Sections 5353, 5053, 5054 and 5055 of the Welfare and Institutions Code of this State." We need not now determine whether so sweeping a waiver of *all* the statutory safeguards surrounding these special proceedings would, or in all circumstances should, be valid;[2] rather, and commendably, the reporter's transcript discloses that the waiver here made was augmented by interrogation and a specificity of facts, so that the validity of the commitment does not rest on giving the waiver an actual effect as broad as it purports to declare on its face.

The trial court first informed petitioner (and a group of other persons being similarly processed) of the nature and purpose of the proceedings, saying:

"All of you ladies and gentlemen before me at the present time have been certified to me by some other Court in which you stand convicted either by plea or conviction by Court or jury of an offense, either a misdeameanor or a felony, and you have been certified to me, to the Court, as possibly being addicted to the use of narcotics.

"The function of this Court on that certification is to appoint doctors and to try to ascertain the facts of whether you are or are not addicted.

"If we find after that examination, after a hearing on that, that you are addicted, then the ultimate order will be the narcotics rehabilitation program, committing you.

"If we find you are not addicted to narcotics, on medical

---

[2]We note, however, that the protection of both the individual and society would seem to be served by, if not to require, a medical examination in any event to verify the person's addicted condition. (Compare Welf. & Inst. Code, § 5050.8, which provides that even where there has been a waiver of hearing in mental illness proceedings, the judge "shall consider the report of the two medical examiners appointed by the court to make a personal examination of the person and to report to the court.")

testimony or otherwise, you will be recertified to the certifying Court for the criminal charge there pending.

"You are here at the present time to be advised of your rights, or at least advised of these proceedings, and of certain rights that you have in respect to them."

The court then appointed the necessary physicians, fixed the date and time of the medical examination, and stated that "Their reports will be rendered to the Court, and the hearing on those reports, and their testimony, will be set the following Wednesday, a week from today . . . at which time you will have the opportunity to present evidence on your own behalf."

Next, to represent those persons (including petitioner) who had no private attorney, the court appointed the Public Defender "to counsel and advise you concerning these proceedings, and we will take any necessary motions or otherwise in your behalf for your protection."

The matter of waiver was then raised by the court as follows: "Those of you who desire to go to the Center right away, waive your time of hearing and be off, on signing the appropriate waivers of time I can see that you are examined this afternoon by the doctors, and if they find you addicted I will have you on your way Friday with the other group that are going, that have already been examined, so those who want to waive their time of hearing and go immediately, raise your hands . . . and give your name to my clerk."

Petitioner called out his name, and that afternoon the court reconvened and questioned him as follows:

"THE COURT: Harry Cruz.

"Mr. Cruz, this morning you were in here and you said that you felt possibly you were actually addicted, wanted to go to the rehabilitation program as soon as possible.

"Do you still feel that way about it?

"MR. CRUZ: Yes.

"THE COURT: You want to go right now?

"MR. CRUZ: Yes.

"THE COURT: During the recess there was shown you a written document, a waiver of various rights and notices. Did you read that?

"MR. CRUZ: Yes.

"THE COURT: Did you talk to the Public Defender about it?

"MR. CRUZ: I did.

"THE COURT: Counseled with him?

"MR. CRUZ: Yes.

"THE COURT: All right, you are still of the same mind,

want to go right away, want to waive those time requirements? If so, you can sign that waiver.''

Petitioner apparently signed the waiver at that time. The court then asked the two physicians who had examined petitioner to give their findings. They testified that ''Mr. Cruz is addicted to narcotics, and he would benefit by the rehabilitation program.'' The physicians' certificate was filed at the same time, reciting petitioner's narcotics history and noting the fact that ''Both arms show evidence of recent use.'' The court ruled that the waiver would be received into evidence, and committed petitioner to the rehabilitation program as a person addicted to narcotics.

Penal Code section 6507 declares that ''Hearing may be waived by consent of the person sought to be committed, expressed in open court.'' In *In re Jones* (1964) *supra,* 61 Cal.2d 325, 329-330 [4], we held in effect that although section 6507 is found in article 3 of chapter 11 of the narcotic addict commitment law (§§ 6500-6510, dealing with ''persons not charged with a crime''), it should likewise be deemed applicable to commitment proceedings instituted—as in the case at bench—pursuant to article 2 of that law (§§ 6450-6454, dealing with ''persons charged with a crime''). We there observed (61 Cal.2d at p. 329, fn. 6) that ''the Legislature does not consider narcotic addicts incompetent to voluntarily submit to treatment,'' and concluded that ''Since voluntary submission to commitment conserves the time and effort of the parties and the judiciary, such waiver, if properly made, should be facilitated.''

The question now to be determined comprehends recognizing the essentials of such a waiver and whether it was here ''properly made.'' On the record in *Jones* we rejected as insufficient an alleged waiver on behalf of the person there committed. That person had been brought before the court without arraignment or notice, and had not personally requested—indeed, had expressed opposition to—commitment as a narcotics addict; in such circumstances we held that the acts of counsel in stipulating to the admission of certain alienists' reports and submitting the entire matter thereon were inadequate to constitute a waiver binding on his client.

■ Here, by contrast, the necessary elements of a valid waiver are present: i.e., (1) petitioner was first fully informed by the court of the nature and purpose of the commitment proceeding and of his rights therein; (2) an attorney was appointed to represent petitioner in this proceeding, and petitioner was given an opportunity to obtain his advice in

regard to the proposed waiver;[3] (3) a medical examination was conducted by court-appointed physicians to verify petitioner's addicted condition; and (4) thereafter the judge in open court questioned petitioner individually as to his desire to begin treatment as soon as possible, received from him the waiver set forth hereinabove, and took in evidence the testimony and report of the examining physicians.

No reason appears why this informed and limited waiver should not be given effect. We do not thereby retreat from our holdings in *In re Jones* (1964) *supra,* 61 Cal.2d 325, 327 [1]-328 [3], or *In re Raner* (1963) *supra,* 59 Cal.2d 635, 637 [1]-643 [6], establishing the principle of strict compliance with each of the statutory prerequisites for maintenance of these special proceedings; but we take this opportunity to commend a practice which, while fully protecting the rights of the individual, permits the start of treatment and rehabilitation to be expedited in uncontested commitment cases and thus "conserves the time and effort of the parties and the judiciary" (*In re Jones* (1964) *supra,* 61 Cal.2d 325, 329, fn. 6).

█ Petitioner was committed to the California Rehabilitation Center on August 14, 1963; on December 13, 1963, he was transferred from the main California Rehabilitation Center facility at Corona to the branch facility located at California Men's Colony-East. He contends that his transfer to and current confinement in that branch amounts to "imprisoning" him "as a criminal," and hence is unconstitutional under *Robinson* v. *California* (1962) *supra,* 370 U.S. 660, 667, as being "cruel and unusual punishment" in violation of the Eighth Amendment (see *In re De La O* (1963) 59 Cal.2d 128, 134-137, 149-150 [13] [28 Cal.Rptr. 489, 378 P.2d 793]). Petitioner alleges that he is "housed among felons imprisoned for all types of offenses," and stresses the Legislature's

---

[3]In a declaration filed with this court Lee B. Ragins, the deputy public defender assigned to defend petitioner (and all those without private counsel), states that it was his practice in such a situation to advise his clients collectively of such matters as the nature of the California Rehabilitation Center, the maximum length of commitment, the average period of confinement, and the alternatives in case of failure on outpatient status. Mr. Ragins also told his clients that "if they desired to contest their commitment, I would cross-examine the doctors and that they would have an opportunity to testify at their hearing," but that if they preferred to enter the program as quickly as possible they would be allowed to waive the statutory time requirements. Finally, Mr. Ragins customarily advised "any person who indicated any hesitancy to enter the program to follow the regularly established court procedure of later examination and hearing."

declaration (Pen. Code, § 2046) that the California Men's Colony is "a state prison for the confinement of males under the custody of the Director of Corrections."

The contention is without merit here. The institutional heart of the addict rehabilitation program remains the California Rehabilitation Center facility at Corona. But that facility is, as it should be, a minimum security institution; as we observed in *In re De La O* (1963) *supra,* 59 Cal.2d 128, 149 [13], the "external indicia of criminality" in this program are unfortunate and should be minimized wherever possible. The security problem may nonetheless be urgent, for at least two reasons. First, many of the persons committed as addicts have long records of petty lawbreaking (see Finestone, *Narcotics and Criminality* (1957) 22 Law & Contemp. Prob. 69-79) and have manifested little respect for authority in any form. Second, the physical and psychological grip of narcotics addiction is so strong that at some point in the treatment process many addicts will tend to rebel and turn uncooperative, preferring in effect the known consolations they find in drug use to the unknown problems they fear having to face upon rehabilitation; yet if the program is to have any hope of long-term success it must remain compulsory, a fact statistically attested to by the high relapse rate of persons voluntarily committed to the federal narcotics hospitals (see Winick, *Narcotics Addiction and Its Treatment* (1957) 22 Law & Contemp. Prob. 9, 23-25).

Under our statutory scheme the Director of Corrections bears the ultimate responsibility for maintaining security in the operation of the rehabilitation program while preserving its chances of success. For minor infractions, of course, customary institutional responses will often be sufficient: e.g., counseling by members of the facility staff, warning as to adverse effect on consideration for release to out-patient status, curtailment or loss of privileges. But in the unfortunate event that such pressures prove inadequate to resolve a difficult security problem, the Legislature has authorized the exercise of two further administrative controls. Penal Code section 6550 provides in relevant part: "There is hereby established an institution, *and branches thereof,* under the jurisdiction of the Department of Corrections, to be known as the California Rehabilitation Center. *Branches may be established in existing institutions of the Department of Corrections . . . ."* (Italics added.) Pursuant to this statutory authority the Director of Corrections has from time to time designated certain facilities of the Department of Corrections as branches

of the main California Rehabilitation Center facility at Corona. One unit of California Men's Colony-East was thus designated on August 7, 1961; and on April 23, 1964, the entire East Facility of the Men's Colony was given such branch status.

Secondly, Penal Code section 6553 provides: "The Director of Corrections shall make rules and regulations for the government of the California Rehabilitation Center and the management of its affairs." Such authority obviously extends to the branches of the California Rehabilitation Center located in other facilities of the Department of Corrections (cf. Pen. Code, §§ 5054, 5058). Pursuant thereto the Director of Corrections has established criteria for the transfer of persons (committed under this program) from the main California Rehabilitation Center facility at Corona to the branch at California Men's Colony-East. ■ In general, persons subject to transfer are those who do not "demonstrate sufficient internal controls to live in a minimum security open institution." In particular, such persons fall into four classes: (1) those who have continual serious adjustment problems;[4] (2) those who are serious escape risks; (3) homosexuals who cannot adjust to the dormitory housing at the Corona facility; and (4) persons who jeopardize internal security by introduction of contraband or by dangerous "acting out" behavior.

■ The facts of the case at bench demonstrate the practical wisdom of these arrangements. Petitioner's record at the Corona facility is a sad one, showing repeated failure to attend vocational classes, repeated refusal to perform routine work assignments, and repeated violation of institutional regulations. (See petitioner's central file, included as a certified exhibit to the People's return.) At first the authorities sought to deal with these infractions by applying such institutional pressures as counseling, admonishment, and reprimand. When —and only when—such methods failed to bring results, petitioner was ordered transferred to the branch facility at California Men's Colony-East. The reasons supporting that order are set forth as follows in petitioner's central file (see classification memorandum of December 12, 1963) : "Subject's behavior and attitude has deteriorated in the past few weeks.

---

[4]Indicative of the policy of retaining each such person in the more permissive atmosphere of the Corona facility if at all·practicable, is the further directive that he may be transferred to California Men's Colony-East "only when very careful efforts have been made to adjust him satisfactorily at this [Corona] facility . . . ." (See Criteria on Transferring CRC Cases to CMC-East, included as a certified exhibit to the People's return.)

Staff has tried with this Subject but Subject seems to be unwilling or unable to fully participate in CRC program. Subject has had several CDC 115s [i.e., violations of institutional rules], has been counselled, has been discussed in the community group, etc. Subject seems to be a young confused individual who finds it difficult to internalize controls and to function in the atmosphere of CRC. Subject received two CDC 115s in the period of less than two weeks, the last CDC 115 written being for being the 'delivery boy' of illegal letters to and from the Women's Unit. It is recommended that Subject be returned to CRC when he shows the ability to handle responsibility and has learned to internalize controls."

Viewed in this light, the transfer of petitioner was a proper exercise of the authority of the Director of Corrections to maintain reasonable security in the operation of the narcotic addict rehabilitation program, and thereby more efficiently promote the potential benefits of the project for all inmates, including petitioner as his responses might ultimately permit.[5]

■ Equally unsupported by the facts is petitioner's further contention that the conditions of his confinement at California Men's Colony-East constitute "cruel and unusual punishment" within the meaning of *Robinson* v. *California* (1962) *supra,* 370 U.S. 660. It is true that the 46 addicts in that facility (see fn. 5, *ante*) are not housed apart from the other inmates, but the People explain that the decision not to segregate them was taken "In order to prevent internal security and management problems and to expose them to the normal actvities of the Facility . . . ." More importantly, these addict inmates are offered a program of treatment and rehabilitation similar in all respects to that of the central facility at Corona: i.e., qualified counseling on a weekly basis in groups of less than 10 men, plus individual counseling when indicated; academic and vocational training, plus regular work assignments; recreational and religious facilities; and periodical progress evaluations with a view to retransfer to the central facility at Corona or direct release to out-patient status.[6] The record shows that each of these benefits has been made available to petitioner; and although he has thus far

---

[5] A perspective on the problem is gained by considering the fact that of the 1,388 male patients in the main California Rehabilitation Center facility and its various branches as of October 9, 1964, only 46 (or 3.3%) were confined in the branch located at California Men's Colony-East. (See letter of Roland W. Wood, Superintendent of the California Rehabilitation Center, to Deputy Attorney General Ringer, dated October 9, 1964, included as a certified exhibit to the People's return.)

[6] As of October 8, 1964, 113 men originally transferred to California Men's Colony-East under this program had been processed as follows:

tended to maintain his uncooperative behavior pattern, his most recent progress review states that "Efforts will be continued through individual counseling to help Cruz see himself as others see him. Hopefully some progress can be made in the areas of motivation and maturity." Nothing in *Robinson* v. *California* (1962) *supra,* 370 U.S. 660, forbids such special civil confinement for the treatment and rehabilitation of the individual addict and for the protection of society.

Petitioner (through his counsel) raises several further contentions which merit, at most, only brief discussion. He stresses the 1963 (*post-De La O*) declaration of legislative intent (Pen. Code, § 6399) to the effect that persons "unresponsive to treatment nevertheless should be kept in the program for purposes of control." The full quotation of that statute, however, speaks of persons "who are *uncooperative with efforts to treat them* or are otherwise unresponsive to treatment . . . ." (Italics added.) We need not consider at this time whether such confinement could constitutionally be imposed on one who for *medical* reasons may be "unresponsive to treatment";[7] here the certified exhibits (see petitioner's central file, *passim*) demonstrate that this petitioner was transferred to the Rehabilitation Center branch at California Men's Colony-East not because he was "unresponsive to treatment" in a medical sense, but simply because he was "uncooperative with efforts to treat him" and had created continuing security problems at the Corona facility. As shown hereinabove, resolution of such security problems is within the power and duty of the Director of Corrections as administrator in charge of this program, and the method here adopted by him, in the light of the facts, is not unreasonable.

Petitioner also suggests that if the California Rehabilitation Center is not a "hospital" as such, it must either be a

---

60 retransferred to the central facility at Corona for further treatment or release; 11 released directly to out-patient status; 2 transferred to the California Medical Facility for psychiatric treatment; 28 discharged by court order; 1 discharged to hold; 11 transferred to the Chino branch of the California Rehabilitation Center (before activation of the central facility at Corona) for further treatment or release. (See memorandum from Deputy Superintendent H. V. Field to Deputy Attorney General Ringer, dated October 8, 1964, included as a certified exhibit to the People's return.)

[7]There is no showing that any such person is being "kept in the program for purposes of control." Rather, it appears from various administrative records which have come before us that, for example, persons who suffer from severe mental disorders (and for that reason are "unresponsive to treatment" for narcotics addiction) are being discharged from the program pursuant to Penal Code sections 6453 or 6509.

"prison" or violate the terms of Health and Safety Code section 11391.[8] The point is without merit. The present narcotic commitment legislation (Stats. 1961, ch. 850, amended Stats. 1963, ch. 1706) was enacted subsequent to Health and Safety Code section 11391 (in its original form, see Stats. 1929, ch. 216, § 2) and to this extent may be deemed to have superseded the earlier (and more general) statute. Manifestly the Legislature did not, by enacting section 11391, render itself impotent to create at a later date a new and specialized type of facility for "the receiving, control, confinement, employment, education, treatment and rehabilitation" of persons addicted or in imminent danger of addiction to narcotics. (Pen. Code, §§ 6400, 6551.)

 Petitioner was convicted (by plea of guilty) of a violation of Health and Safety Code section 11721, which at the time here relevant declared that no person "shall use, or be under the influence of, or be addicted to the use of" unauthorized narcotic drugs. He now argues that the statute under which he was committed (Pen. Code, § 6450, as it then read) deprived him of equal protection of the laws in that it granted the opportunity to demand a jury trial in the superior court on the issue of addiction to those persons committed to the program "after conviction of a misdemeanor *other than* a violation of Section 11721 of the Health and Safety Code." (Italics added.)[9] This contention was considered and rejected in *In re De La O* (1963) *supra,* 59 Cal.2d 128, 151-153 [15]. Petitioner seeks to distinguish *De La O* by pointing out that the defendant in that case had been charged with unlawful use of *and addiction to* narcotics, whereas here the charge was unlawful use and being under the influence of narcotics. But as we observed in *De La O* (at pp. 151-152 [15] of 59 Cal.2d), any of the acts prohibited by Health and Safety Code section 11721 "are important (for the procedures contemplated by Penal Code section 6450) simply as being preliminarily or tentatively indicative of a condition of the

---

[8]Health and Safety Code section 11391 provides:

"No person shall treat an addict for addiction except in one of the following:

"(a) An institution approved by the Board of Medical Examiners, and where the patient is at all times kept under restraint and control.

"(b) A city or county jail.

"(c) A state prison.

"(d) A state narcotic hospital.

"(e) A state hospital.

"(f) A county hospital. . . ."

[9]Subsequent to petitioner's commitment the Legislature deleted this limitation from section 6450, granting such trials to all misdemeanants. (Stats. 1963, ch. 1706, § 7.)

defendant; i.e., a condition which appears to be primarily one of illness rather than criminality . . . .

"Obviously, one who has been convicted of violating (in California) Health and Safety Code section 11721, on any tenable interpretation of its language, has at least demonstrated some history of illegal narcotics use. As a basis for consideration for the civil and remedial procedures delineated by section 6450, conviction of any violation of section 11721 is sufficient. These benefits are potentially open to all persons on the same tests, and there is no denial here of equal protection of the law."

■ Petitioner attacks his underlying conviction of violating Health and Safety Code section 11721 on the ground that although he was under 21 years of age at the time (he was 18 or 19) the court neither notified his parent or guardian nor appointed counsel to represent him; that inaction, petitioner asserts, was "contrary to the mandate of Penal Code Section 858 . . . ." Such a contention, of course, should have been raised by appeal from the judgment of conviction of violating Health and Safety Code section 11721, and in any event is devoid of merit. Penal Code section 858 requires the court to notify the defendant's parent or guardian or to appoint counsel only "If it appears that the defendant may be a minor," in which event "the magistrate shall ascertain whether such is the case . . . ." Here there is no showing that the magistrate in the misdemeanor proceeding had before him any facts from which it should have "appeared" to him that "the defendant may be a minor." In the absence of such facts it was not improper for the magistrate to allow this defendant to waive counsel and plead guilty to a misdemeanor.

Petitioner's further arguments are so devoid of merit[10] as to require no discussion.

The order to show cause is discharged and the petition for habeas corpus is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.

[10]E.g., it is contended that the California Institution for Men (Chino), where petitioner was temporarily confined during his transfer from the Corona facility to California Men's Colony-East (i.e., Dec. 12, 1963, to Jan. 8, 1964), "is a penal institution and not a branch of the California Rehabilitation Center." But petitioner is not now confined in the California Institution for Men (Chino); and in any event, that facility was designated as a branch of the California Rehabilitation Center on August 3, 1962, a year and a half before petitioner's temporary sojourn there. (See Admin. Bull. No. 61/72 (Second Supp.), included as a certified exhibit to the People's return.)